Filed 3/27/25  In re Z.M. CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re Z.M., a Person Coming Under the Juvenile Court Law. | |
| SAN FRANCISCO HUMAN SERVICES AGENCY, Plaintiff and Respondent, v. J.G., Defendant and Appellant. | A171125 (City and County of San Francisco Super. Ct. No. JD20-3162) |

Defendant J.G. (Mother) appeals from an order terminating parental rights under Welfare and Institutions Code section 366.26.[1]  Mother asserts the trial court erred by denying her section 388 petition without an evidentiary hearing and by declining to find that the beneficial parent relationship exception applied.  We affirm.

**BACKGROUND**

Shortly after the minor's birth, the San Francisco Human Services Agency (the Agency) received a referral alleging general neglect based on

---

[1] All undesignated statutory references are to the Welfare and Institutions Code.

Mother's two older children being removed from her care and Mother's history of mental health issues. Mother's oldest child, G.K., was removed from her care because Mother was engaging in prostitution in a vehicle while the child was in the car, and a backpack with a loaded gun was within reach of the child. Mother was unable to reunify with G.K. and, when reunification services were terminated, Mother reported she suffered a mental health breakdown requiring hospitalization. As a result, Mother's second child, A.R., was removed from her care. Mother was "slow" in obtaining mental health services during A.R.'s dependency case, although Mother eventually completed a psychological evaluation, began individual therapy, and completed the Strive visitation program and SafeCare parenting class. Mother ultimately agreed it was in G.K.'s and A.R.'s best interest to be jointly adopted by the maternal adoptive grandparents.[2]

*The Initial Dependency Petition*

Based on the referral, in June 2020, the Agency filed a petition alleging the minor came within the jurisdiction of the juvenile court under section 300 based on Mother's mental health issues, the termination of her parental rights as to the minor's older half-sibling, G.K., and the then-pending hearing to terminate reunification services for Mother in connection with the minor's other half-sibling, A.R.

In the subsequent detention report, the Agency noted that Mother was previously hospitalized for "an acute mental health episode," may experience future mental distress, and could leave the minor without a caregiver. The report noted the minor's half-sibling, A.R., was currently in dependency proceedings and the Agency was recommending terminating reunification

---

[2] Mother was in foster care as a minor, and the maternal adoptive grandparents adopted Mother when she was 13.

services. The social worker for A.R.'s case reported Mother had initially delayed following up on a psychological evaluation, had not engaged with a therapist, was dropped from the SafeCare Program after missing sessions, had not developed a stable support network, and had not progressed to unsupervised visits. In the past few months, however, Mother had engaged in services, and the social worker was not immediately concerned about the minor remaining in Mother's care. The report also noted the father was involved, and the extended family was providing ongoing support and baby supplies for Mother. The Agency recommended the minor remain in Mother's custody, Mother receive family maintenance services, and the father receive supportive services. Mother indicated she wanted to " 'do right by' " the minor and did not object to the Agency's involvement.

The court found the petition true and ordered family maintenance for Mother and supportive services for the father. The court also ordered unsupervised visitation between the minor and the father.

However, at the end of July 2020, at least one incident of domestic violence occurred by the father against Mother while in the presence of the minor. Mother acknowledged a history of domestic violence with past relationships. At the subsequent jurisdictional/dispositional hearing, the court limited the father's visitation to one hour of supervised visitation per week. Apart from this visitation, the court ordered him to stay away from Mother and the minor.

*The First Supplemental Petition*

On February 5, 2021, the Agency filed a supplemental dependency petition. The petition alleged Mother's mental health was unstable and placed the minor at risk of harm; specifically: (1) Mother stole the father's vehicle and intentionally rammed it into a parked car to cause damage while

3

the minor was in the back seat; (2) Mother was arrested for domestic violence after hitting the father in the face multiple times with a plastic water bottle; (3) the father reported that Mother repeatedly left the minor with strangers; and (4) the father reported Mother attempted suicide in his bathroom with a knife while the minor was present. The father provided the Agency with a video of the car incident.

Mother initially lied to the Agency about the car incident and the arrest, claiming the minor was in the care of a friend. However, that friend informed the Agency she was not caring for the minor at that time. Mother later admitted she left the minor alone with the father, despite the court's prior order limiting the father's contact to supervised visitation. Mother claimed her mental health was stable and apologized for lying about the minor's location when she was arrested. She also admitted that she and the minor had been residing with the father for multiple months, and she had been driving the minor without a valid driver's license and with limited driving experience. The paternal great aunt reported that Mother had two car accidents with the minor in the car.

The minor was removed from Mother's custody and placed in an emergency relative placement with the paternal great aunt. At the subsequent hearing, the court ordered the minor detained.

In the subsequent jurisdiction/disposition report, the Agency identified numerous positive steps Mother took since the minor's removal, including remaining in contact with the Agency, ending contact with the father, visiting regularly with the minor, beginning bi-weekly individual therapy, scheduling a psychiatrist appointment to be assessed for psychotropic medication, enrolling in Adult School, and enrolling in a drivers' education program. The report also noted Mother had been applying the skills from her parent

education program to appropriately engage with the minor during visitation.

The report recommended reunification services despite the applicability of section 361.5, subdivision (b),[3] because Mother appeared to be "in a different place" than during the dependency of her older children, had a support system, and was engaging with service providers.

Following a contested hearing with multiple witnesses, the court found the petition allegations true, continued the minor's out-of-home placement, and ordered the continuation of reunification services for Mother. The court ordered Mother to receive supervised visitation and scheduled a six-month review hearing.

In October 2021, the Agency filed a status review report in advance of the six-month review hearing. The Agency's update regarding Mother's progress was generally positive. It stated Mother was engaged in services, including completing her domestic violence classes and domestic violence counseling, attending bi-weekly individual therapy sessions, attending bi-weekly psychiatrist sessions, maintaining stable housing, working towards her high school diploma, completing her substance abuse assessment, and completing her probation from a 2019 grand theft charge. However, the report noted Mother was pregnant with the father's second child, and they had been involved in another domestic violence incident resulting in physical injuries and property damage. The report also stated Mother continued to

---

[3] Section 361.5, subdivision (b), provides in relevant part that reunification services need not be provided to a parent if the "parental rights of a parent over any sibling or half sibling of the child had been permanently severed" and the parent "has not subsequently made a reasonable effort to treat the problems that led to removal of the sibling or half sibling of that child from the parent." (§ 361.5, subd. (b)(11)(A).)

refuse psychotropic medication, and instead continued to self-medicate with marijuana including while pregnant.

During this period, the paternal great aunt noted a potential speech delay with the minor. The minor's pediatrician ordered an audiology study and referred him for speech therapy.

The Agency's November 2021 addendum report indicated Mother continued to address her mental health diagnoses of depression and anxiety and attend therapy sessions. The report also stated Mother completed her psychiatry sessions, as her assessment indicated she did not need psychotropic medication and the psychiatrist believed Mother's mental health was stable. However, the Agency recommended that family reunification services be terminated due to the parents' involvement in ongoing domestic violence with no behavioral changes. The Agency explained the minor remained at high risk of being abused or neglected if returned to Mother's care because the parents failed to mitigate the safety concerns that initiated the dependency, Mother refused to sign consent forms that would allow the Agency to talk to her medical providers, and Mother continued to use marijuana during her pregnancy. The Agency stated the minor had thrived in the care of the paternal great aunt, who expressed an interest in adoption or legal guardianship of the minor.

Contrary to the Agency's recommendation, at the December 2021 status review hearing the court found that Mother made substantial progress toward mitigating the causes of the dependency and ordered that her reunification services continue. The court also specifically ordered Mother to participate in a second medication evaluation, a domestic violence support group, individual domestic violence counseling, weekly therapy, and

substance abuse testing, and for Mother to receive a referral regarding marijuana effects on an unborn baby.

Mother continued to progress and demonstrate effort toward completing her case plan, including engaging in the ordered services. Thus, in January 2022, the Agency recommended continuing Mother's services for an additional six-month period. The court adopted the Agency's recommendation.

In the March and June 2022 status reports, the Agency acknowledged Mother's progress toward meeting court requirements, her work with her service providers, and her apparent motivation to continue to make behavioral changes. However, while the March report recommended continuing services for an additional six months, the June report recommended terminating reunification services. The Agency concluded it was unable to assess Mother's ability to keep the minor safe because she had not progressed to unsupervised and/or overnight visits, and Mother had exceeded the legal time allowed for a family reunification case. Based on the Agency's changed recommendation, the court continued the review hearing to allow Mother time to prepare for and contest the new recommendation.

In September 2022, the Agency filed another status review report. The report summarized Mother's ongoing positive participation in services and again changed its recommendation; the Agency now recommended Mother move towards unsupervised visitation with the goal of progressing toward in-home family maintenance. The report also noted that the minor was receiving speech therapy services, with the paternal great aunt noting dramatic improvements in the minor's communication and speech.

At the subsequent review hearing, the court granted the Agency discretion to allow Mother unsupervised overnight visitation, as well as 30-

7

day extended visits.  Mother successfully cared for the minor during an extended visit and the Agency subsequently recommended the minor be returned to in-home care and Mother receive family maintenance services. The Agency's December 2022 report noted Mother demonstrated her ability to care for the minor and her newborn while engaging with services and coordinating with her providers.  The report also detailed the transition of the minor's speech therapy services into Mother's care.

In December 2022, the court adopted the Agency's recommendations and ordered the minor returned to Mother's care with family maintenance services.  The matter was set for a six-month review hearing.

In the subsequent May 2023 status review report, the Agency described Mother as "warm and nurturing" to the minor and his sibling and noted Mother had coordinated with the minor's pediatrician about possible ADHD and autism diagnoses based on his behavior and slow language development. The report also, however, described Mother as withdrawing from services since having the minor returned to her care: (1) Mother's most recent referral to SafeCare was "closed" due to a lack of participation; (2) her domestic violence counselor closed Mother's case due to lack of participation; (3) Mother stopped all of her medications and stopped attending therapy sessions; and (4) she missed 20 of the last 22 drug tests.  Of the two completed drug tests, both tested positive for marijuana and one tested positive for fentanyl.  The Agency recommended additional family maintenance services.

During the June 2023 status hearing, the minor's counsel raised various concerns regarding the accuracy of the Agency's report and Mother's participation in services.  The court ordered a short continuance for the

minor's counsel to prepare and submit a list of concerns. It also ordered Mother to reengage in bi-weekly drug testing.

In advance of the continued hearing, the Agency submitted an addendum report. With regarding to drug testing, the Agency acknowledged its prior report omitted a positive drug test from December 2022 in which Mother tested positive for fentanyl. The report also summarized various concerns regarding Mother's compliance with her case plan: (1) Mother had not tested since December 2022 and made no effort to comply with the bi-weekly testing ordered by the court; (2) Mother had not attended therapy since September 2022; (3) Mother had not seen her psychiatrist since October 2022 and was last prescribed medication in January 2023; (4) Mother agreed to restart therapy and medications, but had yet to take any steps to do so; (5) Mother received a second referral to SafeCare in January 2023, but it was closed in April due to her lack of participation; (6) Mother stopped working with her Homeless Prenatal Program case worker; and (7) Mother received referrals for the minor to be evaluated for autism and speech delays, but Mother did not pursue further care for the minor. When the Agency social worker attempted to contact Mother, she was unreachable, had not been seen at her home for approximately a week, and her and the minor's locations were unknown.

*The Second Supplemental Petition*

In the beginning of July 2023, the Agency filed a second supplemental petition regarding the minor. The supplemental petition alleged Mother failed to comply with her mental health and substance abuse services, had not followed through with family therapy and medical appointments for the minor, and left the minor and his sibling in the care of the maternal biological grandmother for an extended period despite "extensive concerns"

9

regarding the grandmother's ability to care for the children.  The minor was removed from Mother's custody.

The subsequent detention report explained that the maternal biological grandmother had an extensive child welfare history and had her parental rights terminated as to Mother, overdosed on drugs at the minor's first birthday party, and was disabled and in a wheelchair with limited physical abilities.  The Agency also stated that it repeatedly informed Mother that the grandmother was not authorized to provide any independent care to, or be alone with, the minor.

Based on the Agency reports, the court ordered the minor detained; the minor was again placed in the custody of the paternal great aunt.  The court also ordered Mother to receive supervised visitation.

The court held ten hearing dates on the supplemental petition, beginning in July 2023 and continuing through January 2024.  During these proceedings, the Agency filed addendum reports in October 2023, in which it requested the court sustain the petition, deny Mother further services, and order the minor placed with a relative as his permanent plan.  Mother had "exhausted her time limits" and the Agency recommended family reunification services be terminated for the minor.  The addendum reports also indicated Mother had multiple recent arrests, including two for retail theft, one for DUI, and one for assault with a deadly weapon.  The Agency concluded Mother's criminal behavior, ongoing domestic violence incidents, and use of the maternal grandmother for childcare demonstrated that Mother was "irresponsible, unpredictable and unstable" and a risk to the minor's safety if returned to her care.

In January 2024, at the conclusion of the contested hearings, the court found the allegations in the supplemental petition true.  The court found

Mother had not made significant progress in resolving the problems that led to removal of the minor or demonstrated an ability to complete her treatment plan objectives and provide for the minor's safety. The court terminated reunification services and scheduled a section 366.26 hearing with the permanent plan of adoption.

*Section 366.26 Hearing and Section 388 Petition*

The Agency submitted an April 2024 report in advance of the section 366.26 hearing, recommending parental rights be terminated and adoption be approved as the minor's permanent plan. The Agency noted the minor was "secure and at home" with his paternal great aunt, who had cared for the minor longer than Mother, and the minor looked to the paternal great aunt for "comfort and care." The report noted the paternal great aunt loves the minor and is "an exceptional caregiver" and advocate for the minor, and the minor has "thrived" in her care. The minor's speech "regressed" while in Mother's care, but those skills markedly improved upon his return to his paternal great aunt's care. The minor was happy to see Mother during visitation, but quickly became absorbed in playing with his toys, and the paternal great aunt reported the minor would behaviorally regress after these visits.

The Agency also filed a June 2024 report in advance of the hearing. The report noted certain positive developments: Mother resumed her part-time job caring for the maternal grandmother, Mother's therapist reported that Mother was engaged and had perfect attendance, and Mother was scheduled to complete her probation in the near future. Mother also had consistent participation in various classes through the San Francisco Sheriff's Office, Women's Resource Center. The report also identified some ongoing concerns: (1) Mother had not yet seen a psychiatrist to obtain an evaluation

11

and discuss medication; (2) Mother reported experiencing extensive brain damage and claimed she had only nine years to live (she then retracted these statements); (3) Mother missed six drug tests and tested positive for marijuana on all tests she completed; and (4) Mother continued to be involved in domestic violence incidents. The Agency acknowledged Mother had been working to meet her service plan, but "the object of creating a safe home and environment" for the minor had not been met.

A few days after the Agency's June report was filed, Mother filed a section 388 petition to resume reunification services for an additional six months. Mother argued she was granted family reunification services for the minor's younger brother, was engaged in those services, and was "doing better." Mother asserted additional services would be in the minor's best interest because Mother wants to raise both children, is developing better skills, is on track with services, and wants the minor to have his mother's love and be a family with her and his brother.

Counsel for the minor opposed Mother's petition and requested the court proceed with terminating parental rights. Counsel asserted Mother had not demonstrated changed circumstances or that resuming reunification services would be in his best interest. Specifically, counsel highlighted numerous concerns that arose during the six months the minor had been returned to Mother's care, including: (1) Mother's failure to continue participating in services; (2) Mother's positive drug test for fentanyl with no subsequent testing; (3) Mother's failure to follow up with any service referrals for the minor regarding his medical needs; and (4) Mother's decision to leave the minor and his younger brother in the care of the maternal biological grandmother. Following the minor's removal from Mother's care for the second time, Mother continued to test positive for alcohol and marijuana, was

12

arrested for DUI, and had ongoing domestic violence incidents with multiple individuals.

At the subsequent section 366.26 hearing, the court declined to find the beneficial parent relationship exception applicable, terminated parental rights, and ordered a permanent plan of adoption for the minor. The court also denied Mother's section 388 petition. Mother timely appealed.

**DISCUSSION**

On appeal, Mother argues the trial court erred by (1) denying her section 388 petition, and (2) concluding the beneficial parent relationship exception did not apply. We address each argument below.

## I. Section 388 Petition

Mother contends the juvenile court abused its discretion by denying her section 388 petition without an evidentiary hearing. She contends she made a prima facie case which, if proven at a hearing, would entitle her to relief. We disagree.

### A. Relevant Law

We review a juvenile court's determination to deny a section 388 petition for abuse of discretion. (*In re Brittany K.* (2005) 127 Cal.App.4th 1497, 1505.) Section 388 provides that "[a]ny parent or other person having an interest in a child who is a dependent child of the juvenile court . . . may, upon grounds of change of circumstance or new evidence, petition the court in the same action in which the child was found to be a dependent child of the juvenile court . . . for a hearing to change, modify, or set aside any order of court previously made or to terminate the jurisdiction of the court . . . ." (§ 388, subd. (a)(1).) "If it appears that the best interests of the child . . . may be promoted by the proposed change of order," the juvenile court "shall" order a hearing. (§ 388, subd. (d).)

13

To obtain relief under section 388, the petitioning party must show, by a preponderance of the evidence, both that there is a change of circumstances or new evidence and that the proposed modification is in the child's best interests. (*In re A.S.* (2009) 180 Cal.App.4th 351, 357.) "Not every change in circumstance can justify modification of a prior order. [Citation.] The change in circumstances must relate to the purpose of the order and be such that the modification of the prior order is appropriate. [Citations.] In other words, the problem that initially brought the child within the dependency system must be removed or ameliorated." (*In re A.A.* (2012) 203 Cal.App.4th 597, 612.)

While the petition must be construed liberally, the allegations of the petition cannot be conclusory and must be specific regarding the evidence to be presented. (*In re Alayah J.* (2017) 9 Cal.App.5th 469, 478; *In re Ernesto R.* (2014) 230 Cal.App.4th 219, 222–223.) If the section 388 petition fails to make the requisite showing, it may be denied without an evidentiary hearing. (*In re Mary G.* (2007) 151 Cal.App.4th 184, 205.)

On appeal, we consider the entire procedural and factual history of the case to determine whether the petitioner made a prima facie showing under section 388. (*In re Daniel F.* (2021) 64 Cal.App.5th 701, 711.) Relevant factors may include the seriousness of the reason for dependency, the strength of the child's bond to the present caretakers and potential disruption to that bond, how long a child has been in the dependency system in relation to the parental bond, and the nature of the change. (*In re Kimberly F.* (1997) 56 Cal.App.4th 519, 530–531; *In re D.P.* (2023) 92 Cal.App.5th 1282, 1295.)

### B. Analysis

Mother has failed to demonstrate her section 388 petition, which sought the reinstatement of reunification services, is supported by either changed circumstances or that it would be in the minor's best interest.

First, the only evidence Mother provides of changed circumstances is her recent engagement in reunification services for the minor's younger sibling. This evidence includes various letters indicating that she began working with a Homeless Prenatal Program case manager in May 2024, began attending classes through the San Francisco Sheriff's Office Women's Resource Center in December 2023, started meeting weekly with a psychotherapist in March 2024, has been enrolled in Five Keys Charter School since November 2023, and has been working with Linkages to obtain CalWORKs benefits since June 2023.

But Mother was engaged in all the above-listed services—either in the form of reunification services or family maintenance services—at various points since the minor's initial detention in 2020. Despite numerous years of services and periods of at least partial success, Mother continued to engage in relationships marred by domestic violence (including instances in which she was the perpetrator), test positive for substances, and engage in poor decision making that placed the minor's safety at risk. Most notably, between the beginning of 2024 and the date of her section 388 petition, Mother was involved in multiple domestic violence incidents, with the police being called to her residence eight times. Mother fails to cite any authority supporting her position that, following termination of reunification services for the minor, her participation in services for the minor's sibling constitutes changed circumstances sufficient to support a section 388 petition. (Accord, *In re Ernesto R.*, *supra*, 230 Cal.App.4th at p. 223 [mother's "recent sobriety

reflects 'changing,' not changed, circumstances" in light of her "history of drug relapses."].)

Even assuming such evidence adequately demonstrates changed circumstances, Mother also fails to demonstrate that restarting reunification services would be in the minor's best interest. Mother's petition states she is "working hard to bring" the minor's sibling home, "want[s] to be their mother," and wants them to "be a family again" and "have their mother[']s love."

While we do not question the sincerity of these statements, they do not satisfy Mother's burden of showing, by a preponderance of the evidence, that reunification services would be in the minor's best interests. The petition primarily describes Mother's actions—participating in her case plan, maintaining employment, and creating a safe home. But these statements, while certainly positive, do not demonstrate why reopening reunification services and disrupting the minor's current safe, stable placement would benefit him. Missing is any evidence demonstrating how reunification services would promote the minor's strong interest in stability at this point in the proceedings. While Mother asserts she wants them to be a family and preserve the parent-child bond, those considerations are no longer primary. (See *In re Anthony W.* (2001) 87 Cal.App.4th 246, 251–252 ["At this point in the proceedings, on the eve of the selection and implementation hearing, the children's interest in stability was the court's foremost concern, outweighing any interest mother may have in reunification"].) Rather, the focus turns to permanency and stability. (*In re Malick T.* (2022) 73 Cal.App.5th 1109, 1123.)

Here, the minor has resided with his paternal great aunt for much of his life. The minor has "thrived" in her care, and he looks to the great aunt

16

for "comfort and care." The great aunt loves the minor and is dedicated to raising him. In addition, the great aunt has been proactive at obtaining diagnoses and medical care for the minor, including obtaining an autism diagnosis and regular speech therapy. In contrast, Mother failed to follow through with autism and speech therapy referrals and the minor's speech regressed while he was in her care. Finally, we note this is the *third* dependency petition involving the minor in his short life. These multiple disruptions early in the minor's life make stability and permanency even more crucial for his well-being.

Nothing in Mother's petition explains why her current efforts at participating in her case plan should trump the minor's stability with his paternal great aunt. (See *In re Angel B.* (2002) 97 Cal.App.4th 454, 465 ["[T]here is a rebuttable presumption that, in the absence of continuing reunification services, stability in an existing placement is in the best interest of the child, particularly when such placement is leading to adoption by the long-term caretakers."].) Accordingly, the liberally construed allegations of the petition do not show the minor's best interests would be served by disrupting his placement to offer Mother additional reunification services.

In sum, Mother was not entitled to an evidentiary hearing because the facts alleged, even if supported by evidence given credit at that hearing, would not sustain a favorable decision on the petition. (*In re Zachary G.* (1999) 77 Cal.App.4th 799, 806.)

## II. Beneficial Parent Relationship

Mother next asserts the juvenile court erred in terminating her parental rights instead of ordering a lesser permanent plan. She contends

17

sufficient evidence supported a finding that the beneficial parent relationship exception applied.

### A. Applicable Law

Under section 366.26, once the juvenile court terminates reunification services and determines a dependent child is adoptable—a finding not in dispute here—it must select adoption as the permanent plan and terminate parental rights unless it finds doing so would be detrimental to the child under one of several statutory exceptions.  (§ 366.26, subd. (c)(1); *In re Caden C.* (2021) 11 Cal.5th 614, 630–631 (*Caden C.*).)

The beneficial parent relationship exception applies where the parent has "maintained regular visitation and contact with the child and the child would benefit from continuing the relationship."  (§ 366.26, subd. (c)(1)(B)(i).) In *Caden C.*, the California Supreme Court identified three elements a parent must prove, by a preponderance of the evidence, to establish the exception: (1) the parent's regular visitation and contact with the child; (2) the child's "substantial, positive, emotional attachment to the parent," "the continuation of which would *benefit* the child"; and (3) that the termination of "that attachment would be detrimental to the child even when balanced against the countervailing benefit of a new, adoptive home."  (*Caden C.*, *supra*, 11 Cal.5th at pp. 631, 636.)

In assessing whether terminating parental rights would be detrimental to the child, the court must perform a "case-specific inquiry," asking, "does the benefit of placement in a new, adoptive home outweigh 'the harm [the child] would experience from the loss of [a] significant, positive, emotional relationship with [the parent?]'  [Citation.]  When the relationship with a parent is so important to the child that the security and stability of a new home wouldn't outweigh its loss, termination would be 'detrimental to the

18

child due to' the child's beneficial relationship with a parent." (*Caden C.*, *supra*, 11 Cal.5th at pp. 633–634.) Courts may consider several factors, including "[t]he age of the child, the portion of the child's life spent in the parent's custody, the 'positive' or 'negative' effect of interaction between parent and child, and the child's particular needs." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 576.)

We review the court's findings as to whether the parent has maintained regular visitation and whether the child would benefit from continuing the parent-child relationship for substantial evidence. (*Caden C.*, *supra*, 11 Cal.5th at pp. 639–640.) "[T]he ultimate decision—whether termination of parental rights would be detrimental to the child due to the child's relationship with his parent—is discretionary and properly reviewed for abuse of discretion." (*Id.* at p. 640.)

### B. Analysis

Mother's argument fails on the first prong. While Mother cites to evidence that she regularly visited with the minor during his initial removal from her home in 2021 and 2022, she fails to cite any evidence demonstrating consistent visitation since the minor was removed from her home in July 2023. To the contrary, at the section 366.26 hearing, the paternal great aunt testified that Mother's visitation was not consistent, with a lot of "no-shows" by Mother. The Agency social worker likewise testified that Mother's visitation was not consistent. The Agency's section 366.26 report also indicated Mother's visitation was not consistent, specifically noting that Mother missed four visits in December 2023 because she claimed to be sick but instead visited her boyfriend in South Carolina. That report further documented three additional missed visits in March and April 2024.

19

Accordingly, substantial evidence supports the trial court's finding that visitation was not consistent.

Nor has Mother demonstrated that the termination of any bond would be detrimental to the minor. Undoubtedly, the record indicates an affectionate relationship between her and the minor, and Agency reports describe Mother as warm and nurturing toward the minor during visitation and state the minor is happy to see her and calls her "mama." However, the overall record and history of this matter demonstrate the bond is not "substantial." Notably, the minor has spent most of his life with the paternal great aunt, and the social worker testified the minor is more attached to his great aunt and looks to her for nurturing and support. The paternal great aunt also testified the minor "did not really talk about [Mother] in her absence" and has never requested to communicate with her. And during visitation, the minor does not interact significantly with Mother, is primarily distracted with toys, and displays dysregulation after those visits. Accordingly, substantial evidence supports the trial court's conclusion that the minor would not suffer trauma if the relationship was terminated.

In light of these findings, the court did not abuse its discretion in concluding that the termination of Mother's parental rights would not be detrimental to the minor and the beneficial parent relationship exception does not apply.[4]

---

[4] In Mother's opening brief, she contends the juvenile court failed to comply with the Indian Child Welfare Act (25 U.S.C. § 1901 et seq.; ICWA) because the Agency failed to ask the paternal great aunt about the minor's Indian heritage. In response, County Counsel argues the Agency did, in fact, ask the paternal great aunt (and others) about the possibility of Indian ancestry. In her reply brief, Mother concedes she erred and "agrees with the Agency that it complied with its duties under the ICWA." We accept Mother's concession and need not address this issue.

**DISPOSITION**

The trial court's order denying Mother's section 388 petition and terminating her parental rights is affirmed.

_____

PETROU, J.


WE CONCUR:


_____

FUJISAKI, ACTING P. J.


_____

RODRÍGUEZ, J.


*In re Z.M.*/A171125